## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **Case No.  1:99 CV 1193** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **JOHN DEMJANJUK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This case is before the Court on the Motion of John Demjanjuk pursuant to Fed. R. Civ.

P. 60 (hereafter, "Motion" or "Rule 60 Motion").  (**Doc #: 219**.)  Demjanjuk seeks extraordinary

relief from the denaturalization judgment entered against him on February 21, 2002.  Demjanjuk

alleges that the Government deliberately withheld internal FBI documents, drafted in March

1985, which prevented him from asserting a complete defense.  He contends that had he seen

these documents, he might have prevailed at his 2001 denaturalization proceeding.  Thus, he

asks the Court to authorize such further discovery as is necessary to complete the record, to hold

a hearing on the matter, and to set aside the judgment of denaturalization with prejudice.

The Court has reviewed the Rule 60 Motion and the memorandum in support (Doc ##:

219, 220), the Government's opposition brief (Doc #: 229), and Demjanjuk's reply brief (Doc #:

232), along with the attachments and the record.  For reasons that follow, the Court **DENIES** the

Rule 60 Motion.  To summarize, the Court concludes that the internal FBI documents contain

nothing more than the conjecture of an FBI agent, unsupported by investigation, that would have

made no difference in refuting or undermining the Government's overwhelming evidence at the 2001 denaturalization trial.

## I.

John Demjanjuk, born Iwan Demjanjuk in the Ukraine, was drafted into the Soviet Army in 1940.  In 1941, he was wounded by shrapnel which left a scar on his back.  After a brief hospital stay, he returned to active duty.  In 1942, he was captured by German soldiers in the Battle of the Crimea.  The Germans thereafter transported him to POW camps in Rovno, Ukraine and Chelm, Poland.

At the time of his capture, the Nazis had initiated "Operation Reinhard," a program for the systematic extermination of Jews in Poland.  Extermination camps were constructed to implement Action Reinhard in Poland, including in Sobibor, Belzec and Treblinka.  Because the German SS lacked sufficient manpower to carry out the program, it recruited Soviet war prisoners from the Rovno and Chelm camps to assist.  These recruits were taken to Trawniki, an SS camp where they were trained to implement the program, were given uniforms, and took an oath to serve the SS.

The whereabouts and status of Demjanjuk between the time he arrived at the POW camps in 1942 and the end of World War II have been the subject of numerous legal proceedings both here and abroad.  It is undisputed, however, that following Germany's surrender in 1945, Demjanjuk was taken by American forces to several displaced persons camps, eventually arriving in Regensburg, Germany, where he drove a truck in an American army motor pool from 1947 to 1949.

The Displaced Persons Act of 1948 ("DPA") was enacted to enable "eligible displaced persons" driven from their homelands by World War II to immigrate to the United States regardless of traditional immigration quotas.  *Fedorenko v. United States*, 449 U.S. 490, 495 (1981).  Persons who had "assisted the enemy in persecuting civil[ians]" or who "had voluntarily assisted the enemy forces . . . in their operations," however, were expressly excluded from being displaced persons eligible for immigration under the DPA.  *Id.*  The burden of proving eligibility rested on the applicant, and any person who made "a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person" was deemed inadmissible.  *Id.*

The Immigration and Naturalization Act provides that citizenship can be revoked if it was illegally procured or procured by concealment of a material fact or by willful misrepresentation.  8 U.S.C. § 1451(a).  In 1981, the Supreme Court held that an individual's prior service as an armed concentration camp guard, whether voluntary or involuntary, made that person ineligible for a DPA visa as a matter of law.  *Fedorenko*, 449 U.S. at 509-10.  The Court further held that a DPA visa applicant who failed to disclose that he had been an armed guard at a concentration camp had made a false statement that was material, rendering him inadmissible into the United States.  *Id.*  Where a naturalized citizen was ineligible for a visa, his citizenship was deemed "illegally procured" and subject to revocation.  *Id.* at 514 (citing 8 U.S.C. § 1451(a)).  The right of citizenship once conferred, however, should not be stripped away absent clear, convincing, and unequivocal evidence that the citizenship was procured illegally.  *Id.*, 449 U.S. at 505.

-3-

In 1948, Demjanjuk initiated procedures to immigrate to the United States as an eligible displaced person under the DPA.  As required, he first applied for assistance to the International Refugee Organization ("IRO"), the agency created by the United Nations following the war to assist displaced persons.  During the IRO interview, Demjanjuk represented that he lived and worked in Sobibor, Poland from 1937 to 1943, and in Pilau, Germany from 1943 to 1944.  Demjanjuk next applied for, and received, qualification as an eligible displaced person, representing that he lived and worked in Sobibor from 1936 to 1943, followed by Danzig, Germany from 1943 to 1944, and Munich, Germany from 1944 to 1945.  In 1951, Demjanjuk filed an application for a DPA visa representing that he lived in Sobibor from 1934 to 1943, in Pilau from 1943 to September 1944, and in Munich from September 1944 to May 1945.  In 1952, Demjanjuk moved to the United States after obtaining a visa.

In 1958, Demjanjuk applied for naturalization.  During that process, the Immigration and Naturalization Service checked his immigration and visa file to verify that his entry into the United States was lawful, as lawful entry is a prerequisite for naturalization.  On the application, Demjanjuk denied having ever given false testimony for the purpose of obtaining any benefits under the immigration and naturalization laws.  On November 14, 1958, the U.S. District Court for the Northern District of Ohio naturalized Demjanjuk at which time he changed his first name from Iwan to John.  Demjanjuk eventually moved to Cleveland, Ohio, where he worked at the Ford Motor plant until his retirement 30 years later.

### A.    First Denaturalization Proceeding

The legal battle over the identity and whereabouts of Demjanjuk during war years 1942 to 1945 began in 1977, when the Government instituted a proceeding to denaturalize him for

-4-

illegally procuring his citizenship.  *United States v. Demjanjuk*, Case No. C77-923, N.D. Ohio (Battisti, J.).  The Government contended that Demjanjuk was one of the Russian POW recruits who was trained at Trawniki and served as an SS guard at Treblinka, and that he willfully misrepresented his service and location during the war on his visa and immigration applications to gain admission to the United States.  The Government alleged that he illegally procured his citizenship because his service in Treblinka precluded him from qualifying as an "eligible displaced person" under the DPA which, in turn, precluded him from obtaining a valid DPA visa.  These allegations, if true, were grounds for denaturalization.

The evidentiary centerpiece of the proceeding was a German war document purporting to identify Iwan Demjanjuk as an SS guard at Trawniki ("the Trawniki card"), the original of which was held in the Vinnitskiy Oblast State Archive in the former U.S.S.R.  The back of the Trawniki card bears a photograph of "Iwan Demjanjuk" with John Demjanjuk's correct birth date, father's name, birthplace and nationality.  The card notes as a "special feature" that Iwan Demjanjuk has a scar on his back.  The allegation driving the litigation, however, was the Government's assertion that Demjanjuk was "Ivan the Terrible," a gas chamber operator at Treblinka known for his particularly savage cruelty.

At the denaturalization proceeding, five Treblinka survivors and one guard testified that they knew Ivan the Terrible.  These six witnesses looked at photospreads which included Demjanjuk's 1951 visa picture and the picture of Iwan Demjanjuk on the back of the Trawniki card, and testified that the persons in those two pictures were Ivan the Terrible.  However, apparently neither the Government nor the defense asked these witnesses at trial if they saw Ivan the Terrible in the courtroom.  As a consequence, no witness made an in-court identification of

-5-

Ivan the Terrible.  Although Demjanjuk agreed that the photograph on the Trawniki card resembled him, he maintained – throughout this and every subsequent proceeding – that he was a victim of misidentification, and the Trawniki card was a Soviet forgery.[1]  Demjanjuk denied ever having served the Germans as a guard at Treblinka, Trawniki, or any other concentration camp during the war.  He testified that after his capture by Germans, he was taken first to a POW camp at Rovno, Ukraine around 1942 or 1943; he was next taken to a POW camp at Chelm, Poland where he remained until 1943 or 1944; he was then transported to Graz, Austria for several weeks where he was placed in a unit organized by the Germans for later service against the Russians and where he received a blood group tattoo on the inside of his upper left arm;[2] thereafter, he was transferred to Austria where he was assigned to guard a captured Russian general and where he removed the blood group tattoo.  Demjanjuk admitted that he misrepresented under oath his whereabouts and activities during the war on his visa and immigration applications to avoid repatriation to the U.S.S.R.  He admitted, however, that after 1947 his fear of being forcibly repatriated to the Soviet Union had subsided (i.e., one year before he submitted his IRO application and four years before he submitted his DPA visa application).

On June 23, 1981, the district court issued a decision revoking Demjanjuk's citizenship. *United States v. Demjanjuk*, 518 F.Supp. 1362 (N.D. Ohio 1981).  The court found the Government showed by clear, convincing, and unequivocal evidence that Demjanjuk served the

---

[1]Despite this defense, Demjanjuk conducted no expert documents analysis of the Trawniki card though the original was made available to him for such purpose at trial.  *See Demjanjuk*, 518 F.Supp. at 1382 n. 44.

[2]According to the district court, only persons affiliated with the German SS were given such tattoos.  *United States v. Demjanjuk*, 518 F.Supp.1362, 1377 (N.D. Ohio 1981). The IRO recognized the significance of such tattoos, presumably because they would disqualify an individual from receiving any IRO assistance.  *Id.*

German SS as a guard at both Trawniki and Treblinka in 1942 to 1943, that he was in fact Ivan the Terrible, and that he willfully misrepresented his SS service on his DPA visa application. Because Demjanjuk's citizenship was procured by the willful misrepresentation of material facts, the court concluded, his citizenship must be revoked.  *Id.*, *aff'd per curia*, 680 F.2d 32 (1982), *cert. denied*, 459 U.S. 1036 (1982).

Following deportation and extradition proceedings, Demjanjuk was extradited to Israel to face war crimes charges based on his having been Treblinka gas chamber operator Ivan the Terrible.  In April 1988, an Israeli court found that Demjanjuk was Ivan the Terrible, convicted him of crimes against humanity, and sentenced him to death by hanging.  In the years following this verdict, however, there was much uncertainty concerning the identification of Ivan the Terrible.  According to eyewitness accounts, Ivan the Terrible was a man named Ivan Marchenko who did not resemble Demjanjuk.  There were also allegations that government prosecutors purposely withheld evidence corroborating these accounts.  In July 1993, the Israeli Supreme Court acquitted Demjanjuk of all charges, based largely on statements of Ukrainian guards at Treblinka who identified a man named Ivan Marchenko as Ivan the Terrible.

Following acquittal, the Sixth Circuit reopened, *sua sponte*, the case in which it had denied habeas relief to Demjanjuk from his extradition order.  It did so to determine whether the denaturalization proceeding, upon which all subsequent proceedings were based, had been tainted by prosecutorial misconduct constituting a fraud on the court.  In November 1993, following hearings and the investigation and findings of a special master, the court issued a lengthy opinion concluding that the Government had in fact engaged in prosecutorial misconduct constituting a fraud on the court by failing to disclose to the courts and Demjanjuk evidence

-7-

supporting Demjanjuk's defense that he was misidentified as Ivan the Terrible.  *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993).  Among the evidence the appeals court found the Government had failed to disclose were:  statements of two former Treblinka guards both of whom identified a man other than Demjanjuk as Ivan the Terrible and one of whom identified a man named Ivan Marchenko as the Treblinka gas chamber operator who committed some of the atrocities the Government attributed to Demjanjuk; the statement of one of the guards that a man named Ivan Demjanjuk worked at Treblinka as a cook, that a guard named Marchenko operated the gas chambers, and the man he knew as Ivan Demjanjuk was not pictured in the photospread shown to him; the statement of a Sobibor guard that Demjanjuk was a fellow guard at the camps in Sobibor, Poland and Flossenburg, Germany; statements of five Soviets who served at Trawniki, four of whom could not identify Demjanjuk by the photospread and one whose identification was tentative; and lists of Ukrainian guards at Treblinka, furnished to the prosecutors by the Polish government, which included the name of Marchenko but not Demjanjuk (this, at a time when evidence in the Government's possession suggested Marchenko may well be Ivan the Terrible).  The court found that a careful reading of Demjanjuk's discovery requests demonstrated that he had asked for every bit of this evidence, but the Government failed to provide it because it believed it was under no obligation to do so.  Accordingly, the court vacated the extradition judgments of the trial and appeals courts.

In February 1998, the district court set aside its denaturalization ruling and restored Demjanjuk's U.S. citizenship after finding, among other things, that the prosecutors "acted with reckless disregard" to the requests of counsel and the orders of the court in failing to disclose exculpatory evidence.  *United States v. Demjanjuk*, No. C77-923, 1998 U.S. Dist. LEXIS 4047,

at *18 (N.D. Ohio 1998).  The district court found, in addition to the aforementioned withheld evidence, that the Government had also improperly withheld the identity of an ethnic German, Jacob Reimer, who served as a clerical officer at Trawniki during the period Demjanjuk was alleged to have served there as a guard.  Reimer had subsequently been admitted to the United States and was still living here during the denaturalization proceedings.  He was initially described by the Government as someone who "may turn out to be an important witness," was "a potential source of information about Trawniki generally," and was a clerical official who may have been "able to assist in the authentication of Trawniki documents."  *Demjanjuk*, 1998 U.S. Dist. LEXIS 4047, at *12.  He was interviewed by the lead Government lawyers in February 1980.  However, the only evidence of that interview was a memorandum from one Government attorney to another concluding that Reimer had "no useful information."  *Id.*  The court found that Reimer's existence should have been disclosed to Demjanjuk who could have then determined for himself whether Reimer had useful information.  Although the district court vacated its denaturalization judgment, it denied Demjanjuk's request to dismiss the case with prejudice, the effect of which would have prohibited the Government from bringing another denaturalization proceeding against him.  The court explained, "[j]ust as the government should not be able to profit from its misbehavior, neither should a defendant be insulated from the consequences of his alleged moral turpitude because he becomes the inadvertent beneficiary of sanctions against the government."  *Id*. at *19.

### B.   Second Denaturalization Proceeding

In May 1999, the Government filed a second denaturalization proceeding against Demjanjuk, this time alleging that he persecuted civilian prisoners at the Trawniki, Majdanek,

Sobibor, and Flossenburg concentration camps, but not Treblinka.  (Doc #: 1.)  At trial, the

Government again presented the Trawniki card to identify Demjanjuk.  This time, however, the

Government also presented a disciplinary report which placed Demjanjuk at the Majdanek camp

on January 20, 1943; a transfer roster which placed Demjanjuk at the Sobibor camp beginning

March 26, 1943; and a transfer roster, weapons log, and daily duty rosters which placed

Demjanjuk at the Flossenburg camp for one year beginning October 1943.  Although Demjanjuk

did not testify at trial, his counsel again argued that the Trawniki card was a Soviet forgery, and

that it misidentified Demjanjuk in any event.

Following trial, the court issued Findings of Fact and Conclusions of Law revoking

Demjanjuk's citizenship.  *United States v. Demjanjuk*, No. 1:99CV1193, 2002 WL 544622 (N.D.

Ohio Feb. 21, 2002) (Matia, J.).  The district court found that Demjanjuk had served as an SS

guard at the Trawniki, Majdanek, Sobibor, and Flossenburg camps during the war.  *Id*.  It found

that Demjanjuk had lied on his visa and naturalization applications and concealed his war-time

residences and employment in order to gain admittance into the United States.  *Id.*  The court

concluded that Demjanjuk's service on behalf of the Nazis constituted assistance in the

persecution of a civilian population rendering him ineligible for a DPA visa; thus, his citizenship

was deemed to have been illegally procured.  *Id*., *aff'd*, 367 F.3d 623 (6th Cir. 2004), *cert. denied*,

125 S.Ct. 429 (2004).

Demjanjuk was thereafter deported to Germany where he stood trial in Munich's

Landgericht for being an accessory to murder as a guard at the Sobibor death camp during World

War II.  On April 12, 2011, in the midst of closing arguments, an article was published by

Associated Press ("AP") reporters.  (Doc #: 222-3 ("the AP article").)  The AP article begins:

-10-

An FBI report kept secret for 25 years said the Soviet Union "quite likely fabricated" evidence central to the prosecution of John Demjanjuk – a revelation that could help the defense as closing arguments resume Wednesday in the retired Ohio auto worker's Nazi war crimes trial in Germany.

The newly declassified FBI field office report, . . . casts doubt on the authenticity of a Nazi ID card that is the key piece of evidence in allegations that Demjanjuk served as a guard at the Sobibor death camp in occupied Poland.

Through three decades of U.S. hearings, an extradition, a death sentence followed by acquittal in Israel, a deportation and now a trial in Munich, the arguments have relied heavily on the photo ID from an SS training camp that indicates Demjanjuk was sent to Sobibor.  Claims that the card and other evidence against Demjanjuk are Soviet forgeries have repeatedly been made by Demjanjuk's defense attorneys.  However, the FBI report provides the first known confirmation that American investigators had similar doubts.

(Id. at 1.)

The FBI documents at the heart of this latest controversy are a 1985 cover letter and memo written by now-retired Special Agent Thomas Martin to FBI headquarters.[3]  (Doc #: 229-1 ("Martin Aff."), respectively, Exs. 2 and 3.)  These documents were declassified as "secret" in January 2010.  In the memo, Martin states that Demjanjuk had a reputation for being an anti-Soviet dissident, and outlined the following scheme by which the Soviet Union might use the Department of Justice's Office of Special Investigations ("USDJ/OSI") to punish such dissidents:

1.     Through its spotter service within the Soviet emigre community in the United States, the KGB learns of prominent emigre dissidents speaking out publicly and/or leading emigre groups in opposition to the Soviet leadership in the USSR.

---

[3]The formal names for the cover letter and memo (referenced throughout the briefs) are, respectively, the airtel and the letterhead memorandum,  or "LHM."  These documents were declassified on January 21, 2010.

2.     The KGB, in continuation of internal security measures extended into the United States, initiates an anonymous letter to USDJ/OSI, accusing the dissident of being a former war criminal, guilty of atrocities during World War II.

3.     USDJ/OSI initiates an investigation into background of the accused emigre.  Lacking evidence of the allegation's veracity, USDJ/OSI, thereupon sends results of their investigation to KGB/Moscow, requests review of records seized from Nazi Prison Camps in the aftermath of World War II for evidence which might substantiate the accusation.

4.     The KGB then produces a record purporting to tie the accused with the commission of Nazi atrocities, which record may be falsified for the express purpose of discrediting the accused.

5.     The KGB then makes the questioned records "available" to USDJ for action against the accused in immigration court.  A KGB officer is dispatched from a Soviet embassy or consulate in the United States, to "present" the questioned records in court, but not to permit its examination by document experts.

6.     In court, the KGB officer thereupon "shows" the documents to the judge, but does not permit the documents to be presented in evidence or to be otherwise copied; thus barring United States authorities or the court from examining the authenticity of the records.

7.     The end result is that justice is ill-served in the prosecution of an American citizen on evidence which is not only normally inadmissible, in a court of law, but based on evidence and allegations quite likely fabricated by the KGB.

(Doc #: 229-1, at 11-13.)

In the cover letter to the memo, Martin opines that the *Demjanjuk* matter,

like other similar matters, could easily have been initiated and controlled by the Soviet Intelligence Service KGB as a means of intimidating Soviet emigres by effectively silencing Soviet emigre dissidents who speak out against the Soviet regime, and to demonstrate to those, what many of them are told upon exiting the USSR that the KGB is in close cooperation with the intelligence services of all countries, including the FBI in the U.S. and that any sign of dissident activity will result in harsh measures being brought to bear against them, even though they are in the U.S.

(Id. at 14-15.)  Accordingly, to prevent the USDJ/OSI from becoming a tool of the KGB, Martin requested that the Executive Agencies Unit communicate with the USDJ/OSI in an effort to determine the origin of the anonymous letters to the Department of Justice identifying certain emigres as having been Nazi war criminals.  (Id. at 15.)

Based on the AP article, Demjanjuk's German counsel, Ulrich Busch, filed a motion to stay the criminal proceeding so that he could go to the United States to review Demjanjuk material held at the National Archives in Maryland, where the AP reporters found the FBI documents.  (See generally Doc #: 222-8.)  The Munich court denied Demjanjuk's request to stay that proceeding.  (Id.)  On May 12, 2011, Demjanjuk was convicted of war crimes and sentenced to five years in prison with credit for time served (approximately two years).  Both sides have appealed that ruling, and the appeals are presently pending.  Demjanjuk was released pending further proceedings, and is presently living in a nursing facility in Bavaria due to his health.

Demjanjuk has filed the pending Rule 60 Motion, asking the Court to authorize further discovery based on these documents, to schedule a hearing to complete the record and, upon conclusion, to set aside the denaturalization judgment for prosecutorial misconduct.  He again asks the Court to dismiss the case with prejudice.  The Government challenges the exculpatory value and materiality of the FBI documents.  The Government also contends that Special Agent Martin shared his concerns with Demjanjuk's counsel at the time they were written and urged him to have the Trawniki card forensically tested to assure its authenticity; thus, Demjanjuk was not precluded from taking advantage of whatever exculpatory value those documents may have had at his 2001 trial.

## II.

Demjanjuk brings the pending Motion under Rules 60(b)(6), 60(d)(1), and 60(d)(3) of the Federal Rules of Civil Procedure.  Rule 60 provides relief from a judgment or order either by motion (Rule 60(b)) or by independent action (Rule 60(d)).  *Mitchell v. Rees*, 651 F.3d 593, 594-95 (6th Cir. 2011).

Rule 60(b) allows a district court the discretion to vacate a final judgment for the following reasons:

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any reason justifying relief from the operation of the judgment.

Relief under Rule 60(b) is circumscribed, however, by the public policy favoring the finality of judgments and termination of litigation.  *Info-Hold, Inc. v. Sound Merch., Inc*., 538 F.3d 448, 454 (6th Cir. 2008) (quoting *Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001)).  This is especially true with regard to Rule 60(b)(6), the catch-all provision, which applies "only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule."  *Blue Diamond Coal*, 249 F.3d at 524 (quoting *Olle v. Henry & Wright Corp*., 910 F.2d 357, 365 (6th Cir. 1990)).  "This is because 'almost every conceivable ground for relief is covered' under the other subsections of Rule 60(b)."  *Id*.  Therefore, courts should apply Rule 60(b)(6) relief only in "unusual and extreme situations where principles of equity *mandate* relief."  *Id*. (emphasis in original).

-14-

Rule 60(d)(1) is a savings clause that applies whenever the time for filing a motion for relief under 60(b) expires.  It allows a party to file an independent action to relieve a party from a judgment, order, or proceeding.  The elements necessary for a Rule 60(d)(1) independent cause of action are:

> (1) a judgment which ought not, in equity and good conscience, to be enforced; (2) a good defense to the alleged cause of action on which the judgment is founded; (3) fraud, accident, or mistake which prevented the defendant in the judgment from obtaining the benefit of his defense; (4) the absence of fault or negligence on the part of the defendant; and (5) the absence of any adequate remedy at law."

*Barrett v. Sec'y of Health & Human Servs.*, 840 F.2d 1259, 1263 (6th Cir. 1987); *see also Mitchell*, 651 F.3d at 595.  Furthermore, an independent action is available only to prevent a grave miscarriage of justice, which is a stringent and demanding standard.  *Mitchell*, 651 F.3d at 595 (citing *United States v. Beggerly*, 524 U.S. 38, 47 (1998)).  Where the adverse party is not prejudiced, an independent action for relief may be treated as a 60(b) motion, and conversely, a 60(b) motion may be treated as the institution of an independent action.  *Id*. (inner quotation omitted).

The Sixth Circuit has narrowly interpreted fraud on the court under Rule 60(d)(3).  *McKenna v. Nestle Purina Petcare Co.*, No. C2-05-976, 2011 WL 14418, at *2 (Jan. 3, 2011).  "Fraud upon the court should . . . embrace only that species of fraud which does or attempts to subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct."  *Id*. (quoting *Demjanjuk*, 10 F.3d at 352).  "Relief under Rule 60(d)(3), therefore, is usually 'reserved for circumstances in which, for example, a judge or a juror has been bribed, a bogus

-15-

document is inserted in the record, or improper influence has been exerted upon the court or an attorney so that the integrity of the court and its ability to function is directly impinged.' " *Id.* (quoting *Morawski v. United States Dep't of Agric.*, No. 09-14568, slip. op., 2010 WL 2553201, at *7 (E.D. Mich. Jul. 2, 2002)).  A federal court has the inherent power to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. *Demjanjuk*, 10 F.3d at 358.  Given the potency of this power, however, it must be exercised with restraint and discretion. *Id.*  The party seeking relief under Rule 60 bears the burden of establishing the grounds for such relief by clear and convincing evidence. *Info-Hold*, 538 F.3d at 454 (Rule 60(b)(6)); *Green v. Howes*, No. 5:01-cv-60057, 2011 WL 4345210, at *1 (E.D. Mich. Sep. 16, 2011) (Rule 60(d)(3)).

Importantly, Demjanjuk's request for relief from judgment under <u>all</u> Rule 60 provisions are premised upon his contention that the Government's failure to disclose the internal FBI documents violated *Brady v. Maryland*, 373 U.S. 83 (1963) and constituted a fraud upon the court.

### III.

Demjanjuk contends that the Government has an affirmative and ongoing obligation to disclose exculpatory evidence to the defense, and that failure to do so automatically constitutes a due process violation.  He argues that the internal March 1985 FBI documents constitute exculpatory or impeachment evidence that prosecutors concealed from the defense, and the alleged concealment constitutes prosecutorial misconduct rising to the level of a fraud on the court.

The argument that the Government had the obligation to disclose the FBI documents to Demjanjuk's defense team arises from *Brady v. Maryland*, 373 U.S. 83 (1963).[4]  In *Brady*, the Supreme Court ruled that "suppression by the [government] of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  To establish a *Brady* violation entitling Demjanjuk to relief from judgment under Rule 60, he must show that the Government (1) willfully or inadvertently withheld evidence, (2) favorable to the defendant, (3) that was material.  *Hall v. Russell,* 339 Fed. Appx. 576, 578 (6th Cir. 2009) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

While the prosecution must disclose exculpatory evidence (i.e., evidence favorable to the defendant), the prosecution has no obligation under *Brady* to make a complete and detailed accounting to the defense of all police investigatory work or information that is preliminary, challenged or speculative.  *See, e.g., Giles v. Maryland*, 386 U.S. 66, 98 (1967); *United States v. Agurs*, 427 U.S. 97, 109 (1976)); *United States v. Stifel*, 594 F.Supp. 1525, 1542 n.15 (N.D. Ohio 1984); *United States v. Peltier*, 553 F.Supp. 890, 899 (D.N.D. 1983).  Evidence is "material" where there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Strickler*, 527 U.S. at 281.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  The Supreme Court has held that "*Brady* materiality is not

---

[4]Although *Brady* generally applies only to criminal proceedings, the Sixth Circuit has previously ruled that *Brady* applied to Demjanjuk's first denaturalization proceeding, and there is no reason to think it should not be applied to this second denaturalization proceeding.  *Demjanjuk v. Petrovsky*, 10 F.3d 338, 353-54 (6th Cir. 1994) ("We believe *Brady* should be extended to cover denaturalization and extradition cases where the government seeks denaturalization or extradition based on proof of alleged criminal activities of the party proceeded against.")

a strictly quantitative inquiry.  Rather, it is more of a qualitative inquiry in which a reviewing court must ask whether the suppressed evidence casts sufficient doubt on a [ ] conviction that it puts the case 'in a different light.'" *Smith v. Metrish*, 436 Fed. Appx. 554, 563 (6th Cir. 2011) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995)).  The mere possibility that an item of undisclosed information might have affected the outcome is insufficiently material.  *Peltier*, 553 F.Supp. at 899 (citing *Agurs*, 427 U.S. at 110).  In short, "in order to fall within the scope of the *Brady* rule, the evidence must be both exculpatory and material."  *Caldwell v. Bell*, 9 Fed. Appx. 472, 481 (6th Cir. 2001) (citing *Bagley*, 473 U.S. at 682).

Demjanjuk asserts that the 2001 prosecution team purposely withheld the 1985 FBI documents in violation of *Brady*, and argues that the Court should consider that act to be just one more instance of prosecutorial misconduct dating back to the first denaturalization hearing – justifying further discovery, hearings and dismissal of this case.  The Government denies that prosecutors knew about the FBI documents at the time of the 2001 trial.  At any rate, the Government argues that there is no *Brady* violation because Special Agent Martin shared his concerns over the authenticity of the Trawniki card with Demjanjuk's counsel in the mid-1980's; thus, Demjanjuk was not precluded from taking advantage of whatever exculpatory value the documents had at the time of the 2001 trial.  Even if the prosecution knew about the documents and withheld them, the Government contends there could be no *Brady* violation because Demjanjuk cannot show a reasonable probability that the information contained in those documents would have altered the court's decision.  For reasons explained below, the Court finds that it does not matter whether the Government knew about the documents and failed to disclose them because the FBI documents are neither exculpatory nor material.

According to his affidavit, Special Agent Martin drafted the March 4, 1985 cover letter and memo in direct response to a request from FBI Headquarters for information bearing on the Government's efforts to have Demjanjuk denaturalized and deported.  (Martin Aff. ¶ 10, Ex. 4.) The information in the documents was derived from Martin's impression of Demjanjuk's character based upon newspaper stories; his belief that the Trawniki card was brought to the attention of the DOJ by the Soviets; his belief that neither party nor the court had been allowed to examine the original Trawniki card; his experience that the KGB had a program of targetting anti-Soviet dissidents in the United States; and his belief that Demjanjuk was a prominent anti-Soviet dissident.  (Id. ¶¶ 9, 11.)  In the cover letter summarizing the memo, Martin opines that Demjanjuk's prosecution "could easily have been initiated and controlled by the Soviet Intelligence Service KGB."  (Doc #: 229-1, at 14.)  Martin admits that he conducted no independent investigation, interviewed no witnesses and reviewed no documents prior to writing the memo.  (Martin Aff. ¶ 9.)  The record shows that, had Martin contacted the OSI and/or reviewed the 1981 decision denaturalizing Demjanjuk or the transcript of the proceeding, he would have realized that the prosecution was not prompted by the Soviets; the original Trawniki card had in fact been made available by Soviet authorities for inspection by the Court and Demjanjuk; the card had been forensically tested by an expert documents examiner retained by the Government while Demjanjuk did not have it tested.  *See Demjanjuk*, 518 F.Supp. at 1366-68.  And had Martin conducted a cursory investigation, he would have learned that Demjanjuk was not an outspoken dissident against the Soviet Union.  (See Doc #: 229, at 47 n.32.)

The Court finds that the cover letter and memo contain the speculation of an FBI agent in 1985, premised upon erroneous assumptions and mistaken beliefs, and made without any

-19-

investigation whatsoever.  As such, the FBI documents constitute nothing more than Martin's

generalized theory about a possible scheme by the Soviets targetting anti-Soviet dissidents in

America with no direct connection to John Demjanjuk.  While the prosecution is obligated under

*Brady* to disclose exculpatory evidence, it has no obligation to make a complete accounting to

the defense of all police investigatory work or information that is merely speculative.  *Giles*, 386

U.S. at 98; *Agurs*, 427 U.S. at 109; *Stifel*, 594 F.Supp. at 1542 n. 15; *Peltier*, 553 F.Supp. at 899.

Because the internal FBI documents are merely speculative, they are not exculpatory.

Even if the Court found otherwise, Demjanjuk must still show that the documents are

material.  In other words, he must show that the alleged nondisclosure was so serious there is a

reasonable probability that, had the suppressed evidence been disclosed to the defense, the result

of the proceeding would have been different.  *Strickler*, 527 U.S. at 281.  This he cannot do.

Along with the Findings of Fact and Conclusions of Law issued by the court in 2002, the

court also issued a Supplemental Opinion to explain its inability to give any substantial credence

to Demjanjuk's contentions:

> This is a case of documentary evidence, not eyewitness testimony.  It is
> not at all unusual sixty years after an event that eyewitnesses are not available.
> Indeed, if they were, their testimony would be subjected to close scrutiny because
> of the effect of time and the ravages of age upon memories and eyewitness
> identifications.  The defendant's successful defense against the "Ivan the
> Terrible" charges shows the unreliability of eye witness testimony so long after
> the event.
>
> Documentary evidence, however, is another matter.  In this case
> documents have been retrieved from archives all over eastern Europe and
> Germany.  Defendant has attacked the authenticity of the documents on various
> grounds, but the expert testimony of the document examiners is devastating to
> defendant's contentions.  The paper, inks, and typewriters used to create the
> documents were all in use in Europe on the dates shown on the various
> documents.  The defects in the rubber stamps and typewriters are consistent from
> document to document, and the alignment of the stamp on the photograph and

paper of the service identity pass . . . shows that the photograph was indeed the
one that was originally affixed to the pass.  The randomness and relative rarity of
the documents actually supports their authenticity; if the Soviets had set out to
create false documents, they would not have allowed the omissions and minor
inaccuracies that occur in the trail of documents in this case.  The location of
these documents in the archives of several different countries also buttresses their
authenticity, as their dispersal at the chaotic end of World War II does not seem at
all unusual.  The various spellings of defendant's last name in the documents
actually lends further credence to them, since the conversion from the Cyrillic
alphabet to the western alphabet produces such variations and a counterfeiter
would probably have used one spelling consistently.

*Demjanjuk*, 2002 WL 544623, at \*1.  The court further explained:

Although defendant claims he was not at the camps indicated by the documentary
evidence, he has not given the Court any credible evidence of where he was
during most of World War II after the prisoner-of-war camp at Rovno.  Defendant
did not testify in person at the trial of this case, but his testimony on previous
occasions was introduced as evidence in this case.  The Court thoroughly
reviewed his prior testimony and was struck by the almost complete absence of
any specific detail of the kind that would lend credence to his version.  Moreover,
his testimony changed concerning dates, work assignments, how he came to list
Sobibor as a place of residence when he filled out his Application for Assistance
to the Preparatory Commission of the [IRO] and other matters.

        The government had the burden of proving its contention to the Court by
clear, convincing, and unequivocal evidence.  It did so.  Although the Court
carefully considered the evidence submitted by defendant to attempt to keep the
government from satisfying its burden, the defendant's evidence was not
sufficiently credible to cast doubt on the documentary evidence.

*Demjanjuk*, 2002 WL 544623, at \*4-5, *aff'd*, 367 F.3d 623 (6th Cir. 2004), *cert. denied*, 125 S.Ct.

429 (2004).

        The Court finds that Special Agent Martin's theory about a possible Soviet scheme

targeting anti-Soviet dissidents is no match, quantitatively or qualitatively, for the considerable

documentary evidence presented by the Government and supported by expert authentication in

the 2001 trial, which evidence placed Demjanjuk in numerous concentration camps during the

war.  *Metrish*, 436 Fed. Appx. at 563; *Kyles*, 514 U.S. at 434-35.  And the mere possibility that

-21-

an item of undisclosed information might have affected the outcome is insufficiently material. *Peltier*, 553 F.Supp. at 899; *Agurs*, 427 U.S. at 110.  The theory espoused in Martin's 1985 cover letter and memo are also distinct from the substance and mass of hard evidence the prosecution eventually admitted withholding in the first denaturalization proceeding, which evidence supported Demjanjuk's misidentification defense and sufficiently undermined confidence in the outcome of that proceeding (e.g., witness identifications of Ivan Marchenko as Ivan the Terrible, lists provided by the Polish government of guards at Treblinka which include the name Ivan Marchenko and not Demjanjuk, the identification of Demjanjuk as a guard at Sobibor and Flossenburg by a fellow guard, the failure to provide Demjanjuk with the name of Jacob Reimer).

Because the FBI documents lack materiality, their alleged concealment by the Government does not violate *Brady*.  Against the backdrop of a public policy strongly favoring the finality of judgments, the Court concludes that the alleged failure to disclose the internal FBI documents does not violate *Brady*, would not have affected the outcome of this proceeding, does not constitute a fraud upon the court or a grave miscarriage of justice, and does not warrant the extraordinary relief Demjanjuk seeks under Rule 60.

It is important to remember that citizenship can be revoked if it was procured by concealment, or willful misrepresentation, of a material fact.  John Demjanjuk has admitted that he willfully lied about his whereabouts during the war on his visa and immigration applications to gain entry to the United States.  Despite numerous opportunities, Demjanjuk has never provided a single, consistent accounting of his whereabouts during the war years 1942 to 1945. On the other hand, the Government has provided clear, convincing and unequivocal evidence

that Demjanjuk not only lied about his whereabouts during the war, but that he served as a guard at the Sobibor, Trawniki, Majdanek and Flossenburg concentration camps.  Such service during the war made him ineligible as a matter of law for a displaced persons visa, rendering his naturalization illegally procured and subject to revocation.

## IV.

The Government's first attempt to strip Demjanjuk of his citizenship was tainted by misconduct, and the federal courts remedied the situation by reversing the denaturalization and restoring Demjanjuk's citizenship.  The second denaturalization proceeding did not suffer from the same problems, notwithstanding Demjanjuk's protestations to the contrary.

The only question before the undersigned today is whether the alleged failure to disclose the March 1985 FBI documents constitute a fraud on the court (i.e., extraordinary circumstances) justifying Rule 60 relief.  For the reasons explained herein, the Court concludes that it does not.  Accordingly, the Court **DENIES** the Motion of John Demjanjuk Pursuant to Fed. R. Civ. P. 60 (**Doc #: 219**).

**IT IS SO ORDERED.**

*/s/ Dan A. Polster    December 20, 2011*
**Dan Aaron Polster**
**United States District Judge**